**CAROL BARNHART INC.,**
Plaintiff-Appellant,

v.

**ECONOMY COVER CORPORATION,**
Defendant-Appellee.

**No. 1295, Docket 84–7867.**

United States Court of Appeals,
Second Circuit.

Argued June 6, 1985.
Decided Sept. 12, 1985.

**412**

Steven B. Pokotilow, New York City (Blum Kaplan Friedman, Silberman & Beran, Laura E. Goldbard, Anita K. Yeung, New York City, of counsel), for plaintiff-appellant.

Jordan B. Bierman, New York City (Eugene V. Handy, Jr., Bierman, Bierman & Peroff, New York City, of counsel), for defendant-appellee.

Before MANSFIELD, MESKILL and NEWMAN, Circuit Judges.

MANSFIELD, Circuit Judge:

Carol Barnhart Inc. ("Barnhart"), which sells display forms to department stores, distributors, and small retail stores, appeals from a judgment of the Eastern District of New York, Leonard D. Wexler, *Judge*, granting a motion for summary judgment made by defendant Economy Cover Corporation ("Economy"), which sells a wide variety of display products primarily to jobbers and distributors. Barnhart's complaint alleges that Economy has infringed its copyright and engaged in unfair competition by offering for sale display forms copied from four original "sculptural forms" to which Barnhart holds the copyright. Judge Wexler granted Economy's motion for summary judgment on the ground that plaintiff's mannequins of partial human torsos used to display articles of clothing are utilitarian articles not containing separable works of art, and thus are not copyrightable. We affirm.

The bones of contention are four human torso forms designed by Barnhart, each of which is life-size, without neck, arms, or a back, and made of expandable white styrene. Plaintiff's president created the forms in 1982 by using clay, buttons, and fabric to develop an initial mold, which she then used to build an aluminum mold into which the poly-styrene is poured to manufacture the sculptural display form. There are two male and two female upper torsos. One each of the male and female torsos is unclad for the purpose of displaying shirts and sweaters, while the other two are sculpted with shirts for displaying sweaters and jackets. All the forms, which are otherwise life-like and anatomically accurate, have hollow backs designed to hold excess fabric when the garment is fitted onto the form. Barnhart's advertising stresses the forms' uses to display items such as sweaters, blouses, and dress shirts, and states that they come "[p]ackaged in UPS-size boxes for easy shipping and [are] sold in multiples of twelve."

Plaintiff created the first of the forms, Men's Shirt, shortly after its founding in March, 1982, and by the end of July it had attracted $18,000 worth of orders. By December 1982, plaintiff had designed all four forms, and during the first morning of the twice-yearly trade show sponsored by the National Association of the Display Industry ("NADI"), customers had placed $35,-000 in orders for the forms. Plaintiff's president maintains that the favorable response from visual merchandisers, Barnhart's primary customers, "convinced me that my forms were being purchased not only for their function but for their artistically sculptured features."

Economy, which sells its wide range of products primarily to jobbers, distributors, and national chain stores, not to retail stores, first learned in early 1983 that Barnhart was selling its display forms directly to retailers. After observing that no copyright notice appeared either on Barnhart's forms or in its promotional literature, Economy contracted to have produced for it four forms which it has conceded, for purposes of its summary judgment motion, were "copied from Barnhart's display forms" and are "substantially similar to Barnhart's display forms." Economy began marketing its product, "Easy Pin Shell Forms," in September 1983. Later in the same month, Barnhart wrote to NADI to complain that Economy was selling exact duplicates of Barnhart's sculptural forms at a lower price and asked it to stop the duplication and underselling. Economy responded with a letter from its counsel dated October 17, 1983 to the Chairman of NADI's Ethics Committee stating that Economy was not guilty of any "underhanded" business practices since Barnhart's forms were not protected by "patent, copyright, trademark, or otherwise."

On the same date (October 17, 1983) Barnhart applied for copyright registration for a number of products, including the four forms at issue here. It identified each of the forms as "sculpture" and sought expedited examination of its applications because of the possibility of litigation over copyright infringement. Copyright regis-

tration was granted the same day. Then, on October 18, Barnhart informed Economy that its Easy Pin Shell Forms violated Barnhart's rights and demanded that it discontinue its advertising and sale of the forms. In November 1983, more than 18 months after selling its first form, Barnhart advised its customers that copyright notice had "inadvertently [been] omitted" from the display forms previously distributed and enclosed adhesive stickers bearing a copyright notice, which it asked the customers to affix to unmarked products in inventory.

Barnhart filed this suit in December 1983. Count I charges Economy with violating Barnhart's rights under the Copyright Act, 17 U.S.C. §§ 101–810 (1982), by copying and selling Barnhart's four display forms. Count II alleges that Economy has engaged in unfair competition under the common law of the State of New York. The complaint seeks an adjudication that Economy has infringed Barnhart's copyrights, a preliminary and permanent injunction against Economy's producing, advertising, or selling its forms, damages (consequential, statutory, and punitive), and attorney's fees. Economy moved for summary judgment on the issue of the copyrightability of Barnhart's display forms (and the issue of statutory damages and attorney's fees).

After a hearing on February 3, 1984, Judge Wexler issued an order and opinion on September 12, 1984 granting defendant's motion for summary judgment on the issue of copyrightability. 594 F.Supp. 364 (E.D.N.Y.1984). The district court rejected plaintiff's arguments that the issue of copyrightability was an improper subject for summary judgment and that the Copyright Office's issuance of certificates of registration for Barnhart's four forms created an insurmountable presumption of the validity of the copyrights. On the central issue of copyrightability, it reviewed the statutory language, legislative history, and recent case authority, concluding that they all speak with "a single voice," i.e., that a useful article may be copyrighted only to

the extent that "there is a physically or conceptually separable work of art embellishing it...." *Id.* at 370. Applying this test, the district court determined that since the Barnhart forms possessed no aesthetic features that could exist, either physically or conceptually, separate from the forms as utilitarian articles, they were not copyrightable.

On March 6, 1985, 603 F.Supp. 432, Judge Wexler denied Barnhart's motion for reargument. The present appeal followed.

## DISCUSSION

■ Appellant's threshold argument, that the district court erred in ignoring the statutory presumption of validity accorded to a certificate of copyright registration and to the line-drawing expertise of the Copyright Office, can be disposed of briefly. With respect to the prima facie validity of Copyright Office determinations, 17 U.S.C. § 410(c) states:

"In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court."

However, "a certificate of registration creates no irrebuttable presumption of copyright validity." *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980). Extending a presumption of validity to a certificate of copyright registration "merely orders the burdens of proof. The plaintiff should not ordinarily be forced in the first instance to prove all of the multitude of facts that underline the validity of the copyright unless the defendant, by effectively challenging them, shifts the burden of doing so to the plaintiff."

H.Rep. No. 1476, 94th Cong., 2d Sess. 157, *reprinted in* 1976 U.S.Code Cong. & Ad. News 5659, 5773. *See also Oboler v. Goldin,* 714 F.2d 211, 212 (2d Cir.1983); 3 M. Nimmer, Nimmer on Copyright § 12.11[B], at 12–79 to 12–80 (1985).

■ Judge Wexler properly exercised the discretion conferred on him by 17 U.S.C. § 410(c). Once defendant's response to plaintiff's claim put in issue whether the four Barnhart forms were copyrightable, he correctly reasoned that the "mute testimony" of the forms put him in as good a position as the Copyright Office to decide the issue. While the expertise of the Copyright Office is in "interpretation of the law and its application to the facts presented by the copyright application," *Norris Industries, Inc. v. I.T. & T.,* 696 F.2d 918, 922 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983), it is permissible for the district court itself to consider how the copyright law applies to the articles under consideration.[1]

Since the four Barnhart forms are concededly useful articles, the crucial issue in determining their copyrightability is whether they possess artistic or aesthetic features that are physically or conceptually separable from their utilitarian dimension. A "useful article" is defined in 17 U.S.C. § 101 as "an article having an intrinsic utilitarian function that is not merely to

---

**1.** Appellant's failure to provide copyright notice until 18 months after initial distribution of its forms is not fatal to its claim. 17 U.S.C. § 405(a)(2) provides:

"The omission of the copyright notice prescribed by sections 401 through 403 from copies of phonorecords publicly distributed by authority of the copyright owner does not invalidate the copyright in a work if—

\*　　\*　　\*　　\*　　\*　　\*

"(2) registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies or phonorecords that are distributed to the public in the United States after the omission has been discovered; or ...."

At oral argument counsel for appellant maintained that Barnhart's president had made no affirmative decision not to copyright her forms from the very beginning; rather, she later discovered this omission and took steps to remedy it by corresponding with previous purchasers of the forms.

portray the appearance of the article or to convey information." Although 17 U.S.C. § 102(a)(5) extends copyright protection to "pictorial, graphic, and sculptural works," the definition of "pictorial, graphic, and sculptural works," at 17 U.S.C. § 101, provides that the design of a useful article

> "shall be considered a pictorial, graphic, or sculptural work only if, and only, to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."

To interpret the scope and applicability of this language, and the extent to which it may protect useful articles such as the four Barnhart forms, we must turn to the legislative history of the 1976 Copyright Act, which is informative.

Congress, acting under the authority of Art. I, § 8, cl. 8 of the Constitution, extended copyright protection to three-dimensional works of art in the Copyright Act of 1870, which defined copyrightable subject matter as:

> "any book, map, chart, dramatic or musical composition, engraving, cut, print, or photograph or negative thereof, or of a painting, drawing, chromo, statue, statuary, and of models or designs intended to be perfected as works of the fine arts...." Act. of July 8, 1870, ch. 230, § 86, 16 Stat. 198, 212 (repealed 1916).

The Supreme Court upheld an expansive reading of "authors" and "writings" in *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60, 4 S.Ct. 279, 282, 28 L.Ed. 349 (1884), rejecting the claim that Congress lacked the constitutional authority to extend copyright protection to photographs and negatives thereof. The Court further contributed to the liberalization of copyright law in *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903) (Holmes, J.), in which it held that chromo-lithographs used on a circus poster were not barred from protection under the copyright laws. In *Bleistein*, Justice Holmes stated his famous "anti-discrimination" principle:

> "It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits. At the one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke. It may be more than doubted, for instance, whether the etchings of Goya or the paintings of Manet would have been sure of protection when seen for the first time. At the other end, copyright would be denied to pictures which appealed to a public less educated than the judge." *Id.* at 251–52, 23 S.Ct. at 300–01.

The Copyright Act of 1909 expanded the scope of the copyright statute to protect not only traditional fine arts, but also "[w]orks of art; models or designs for works of art." Copyright Act of 1909, ch. 320, § 5(g), 35 Stat. 1075, 1077 (codified at 17 U.S.C. §§ 1–216 (1976)), *reprinted in* 4 M. Nimmer, *supra,* App. 6, at 6–5. However, this language was narrowly interpreted by Copyright Office regulations issued in 1910, which stated in part:

> "*Works of art.*—This term includes all works belonging fairly to the so-called fine arts. (Paintings, drawings, and sculpture).
>
> "Productions of the industrial arts utilitarian in purpose and character are not subject to copyright registration, even if artistically made or ornamented." Copyright Office, Rules and Regulations for the Registration of Claims to Copyright, Bulletin No. 15 (1910), 8; *reprinted in Mazer v. Stein*, 347 U.S. 201, 212 n. 23, 74 S.Ct. 460, 467 n. 23, 98 L.Ed. 630 (1954).

The prospects for a work of applied art obtaining a copyright were enhanced in December 1948, when the Copyright Office changed the definition of a "work of art" in its Regulation § 202.8:

> "*Works of art (Class G)—(a) In General* This class includes works of artis-

tic craftsmanship, in so far as their form but not their mechanical or utilitarian aspects are concerned, such as artistic jewelry, enamels, glassware, and tapestries, as well as all works belonging to the fine arts, such as paintings, drawings and sculpture." 37 C.F.R. § 202.8 (1949), *reprinted in Mazer v. Stein, supra,* 347 U.S. at 212–13, 74 S.Ct. at 467–68. While this regulation seemed to expand coverage for works of applied art, it did not explicitly extend copyright protection to industrial design objects.

The next significant historical step was taken not by Congress but by the Supreme Court in its 1954 decision in *Mazer v. Stein, supra,* where it upheld § 202.8 as a proper standard for determining when a work of applied art is entitled to copyright protection, in the context of deciding whether lamps which used statuettes of male and female dancing figures made of semivitreous china as bases were copyrightable. The narrow question faced was whether the addition of the lamp attachments deprived the statuettes of the copyright protection to which they were separately entitled. The Court answered that question in the negative, holding that an ornamental design does not necessarily cease to be artistic when embodied in a useful article and may therefore be entitled to copyright protection. *Id.* at 214, 74 S.Ct. at 468.

The Copyright Office implemented *Mazer v. Stein* by promulgating new regulations interpreting § 5(g) of the 1909 Act, which stated in part:

"(c) If the sole intrinsic function of an article is its utility, the fact that the article is unique and attractively shaped will not qualify it as a work of art. However, if the shape of a utilitarian article incorporates features, such as artistic sculpture, carving, or pictorial representation, which can be identified separately and are capable of existing independently as a work of art, such features will be eligible for registration." 37 C.F.R. § 202.10(c) ((1959), as amended June 18, 1959) (revoked 1978), *reprinted in* 4 M. Nimmer, *supra,* App. 11, at 11–13, to 11–14 (1985).

In an effort to provide some form of protection to "three-dimensional designs of utilitarian articles as such," a number of separate design bills were introduced into Congress. *See, e.g.,* H.R. 8873 (Willis Bill), 85th Cong., 1st Sess. July 23, 1957, and S. 2075 (O'Mahoney-Wiley-Hart Bill), 86th Cong., 1st Sess. May 28, 1959. Finally, Title II of a bill passed by the Senate in 1975, S.22 (The Design Protection Act of 1975), proposed to offer legal protection to the creators of ornamental designs of useful articles.[2] It defined "pictorial, graphic,

**2.** The Senate Report offered this description of Title II's purpose:

"The purpose of the proposed legislation, as amended, is to encourage the creation of original ornamental designs of useful articles by protecting the authors of such designs for a limited time against unauthorized copying. The title is intended to offer the creator of ornamental designs of useful articles a new form of protection directed toward the special problems arising in the design field, and is intended to avoid the defects of the existing copyright and design patent statutes by providing simple, easily secured, and effective design protection for the period of 5 years, or, if renewed, a period of 10 years, under appropriate safeguards and conditions.

"Such designs are presently protected by design patents issued under title 35, United States Code, if they meet the requirements of title 35. A design patent may not be issued until a search has been made to determine that such design possesses novelty. The de-

sign patent law, while affording protection to some designs, has proved adequate to protect those whose designs have only a short life expectancy.

"The present copyright statute is equally inappropriate for the protection of such designs. The term of copyright protection is too long for the majority of designs. The scope of copyright protection is too broad, while the notice and registration requirements do not fit the needs of design protection. Also, the copyright law protects only those designs which can be separately identified as 'works of art.'

"Because of the limitations of both the design patent and copyright laws, this legislation proposes to establish a new form of protection for 'original ornamental designs of useful articles.' The subject matter of the bill is limited to designs of useful articles, the term 'design' referring to those features of the useful article intended to give it an ornamental appearance. The protection provided by this

and sculptural works" to "include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, plans, diagrams, and models."

The House, however, responded by passing a strikingly different version. To the text passed by the Senate it added the following:

"Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."

Both of the added clauses were from work of the Copyright Office: the first from its 1948 Regulation § 202.8, approved by the Supreme Court in *Mazer v. Stein;* the second from its post-*Mazer* § 202.10(c).[3] The bill as finally enacted omitted entirely the proposed Title II.[4]

legislation would begin when a useful article, bearing the design, is made public, and would last for 5 or, if renewed, 10 years." S.Rep. No. 473, 94th Cong., 1st Sess. 161–62 (1975).

**3.** The House Report offered this explanation for the change in definition:

"In adopting this amendatory language, the Committee is seeking to draw as clear a line as possible between copyrightable works of applied art and uncopyrighted works of industrial design. A two-dimensional painting, drawing, or graphic work is still capable of being identified as such when it is printed on or applied to utilitarian articles such as textile fabrics, wallpaper, containers, and the like. The same is true when a statute or carving is used to embellish an industrial product or, as in the *Mazer* case, is incorporated into a product without losing its ability to exist independently as a work of art. On the other hand, although the shape of an industrial product may be aesthetically satisfying and valuable, the Committee's intention is not to offer it copyright protection under the bill. Unless the shape of an automobile, airplane, ladies' dress, food processor, television set, or any other industrial product contains some element that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article, the design would not be copyrighted under the bill. The test of separability and independence from 'the utilitarian aspects of the article' does not depend upon the nature of the design—that is, even if the appearance of an article is determined by esthetic (as opposed to functional) considerations, only elements, if any, which can be identified separately from the useful article as such are copyrightable. And, even if the three-dimensional design contains some such element (for example, a carving on the back of a chair or a floral relief design on silver flatware), copyright protection would extend only to that element, and would not cover the over-all configuration of the utilitarian article

as such." H.R.Rep. No. 1476, *supra,* at 55, 1976 U.S.Code Cong. & Ad.News at 5668.
One commentator has stated:
"The amended text thus subjected virtually all industrial art seeking copyright protection under Title I to the separability criterion of sections 101 and 102(a)(5).... This doctrine of separability could then authorize the denial of copyrightability to modern, functional designs...." Reichman, Design Protection in Domestic and Foreign Copyright Law: From the Berne Revision of 1948 to the Copyright Act of 1976, 1983 Duke L.J. 1143, 1261.

**4.** The House Report explained this deletion as follows:
"In reporting S. 22, the House Judiciary Committee has deleted Title II. Until 1954, designs for useful articles were not generally subject to copyright protection. The primary protection available was the design patent, which requires that the design be not only 'original', the standard applied in copyright law, but also 'novel', meaning that it has never before existed anywhere.
"However, in 1954 the Supreme Court decided the case of *Mazer v. Stein,* 347 U.S. 201 [74 S.Ct. 460, 98 L.Ed. 630], in which it held that works of art which are incorporated into the design of useful articles, but which are capable of standing by themselves as art works separate from the useful article, are copyrightable. The example used in the *Mazer* case was an ornamental lamp base.
"Title II of S. 22 as passed by the Senate would create a new limited form of copyright protection for 'original' designs which are clearly a part of a useful article, regardless of whether such designs could stand by themselves, separate from the article itself. Thus designs of useful articles which do not meet the design patent standard of 'novelty' would for the first time be protected.
"S. 22 is a copyright revision bill. The Committee chose to delete Title II in part because the new form of design protection provided by Title II could not truly be con-

■ The legislative history thus confirms that, while copyright protection has increasingly been extended to cover articles having a utilitarian dimension, Congress has explicitly refused copyright protection for works of applied art or industrial design which have aesthetic or artistic features that cannot be identified separately from the useful article. Such works are not copyrightable regardless of the fact that they may be "aesthetically satisfying and valuable." H.R.Rep. No. 1476, *supra*, at 55, 1976 U.S.Code Cong. & Ad.News at 5668.

■ Applying these principles, we are persuaded that since the aesthetic and artistic features of the Barnhart forms are inseparable from the forms' use as utilitarian articles the forms are not copyrightable. Appellant emphasizes that clay sculpting, often used in traditional sculpture, was used in making the molds for the forms. It also stresses that the forms have been responded to as sculptural forms, and have been used for purposes other than modeling clothes, e.g., as decorating props and signs without any clothing or accessories. While this may indicate that the forms are "aesthetically satisfying and valuable," it is insufficient to show that the forms possess aesthetic or artistic features that are physically or conceptually separable from the forms' use as utilitarian objects to display clothes. On the contrary, to the extent the forms possess aesthetically pleasing features, even when these features are considered in the aggregate, they cannot be conceptualized as existing independently of their utilitarian function.

Appellant seeks to rebut this conclusion by arguing that the four forms represent a concrete expression of a particular idea, e.g., the idea of a woman's blouse, and that the form involved, a human torso, is traditionally copyrightable. Appellant suggests that since the Barnhart forms fall within the traditional category of sculpture of the human body, they should be subjected to a lower level of scrutiny in determining its copyrightability. We disagree. We find no support in the statutory language or legislative history for the claim that merely because a utilitarian article falls within a traditional art form it is entitled to a lower level of scrutiny in determining its copyrightability. Recognition of such a claim would in any event conflict with the anti-discrimination principle Justice Holmes enunciated in *Bleistein v. Donaldson Lithographing Co., supra,* 188 U.S. at 251–52, 23 S.Ct. at 300.

Nor do we agree that copyrightability here is dictated by our decision in *Kieselstein-Cord v. Accessories by Pearl, Inc.,* 632 F.2d 989 (2d Cir.1980), a case we described as being "on a razor's edge of copyright law." There we were called on to determine whether two belt buckles bearing sculptured designs cast in precious metals and principally used for decoration were copyrightable. Various versions of these buckles in silver and gold sold wholesale at prices ranging from $147.50 to $6,000 and were offered by high fashion and jewelry stores. Some had also been accepted by the Metropolitan Museum of Art for its permanent collection.

sidered copyright protection and therefore appropriately within the scope of copyright revision.

"In addition, Title II left unanswered at least two fundamental issues which will require further study by the Congress. These are: first, what agency should administer this new design protection system and, second, should typeface designs be given the protections of the title?

"Finally, the Committee will have to examine further the assertion of the Department of Justice, which testified in opposition to the Title, that Title II would create a new monopoly which has not been justified by a showing

that its benefits will outweigh the disadvantage of removing such designs from free public use.

"The issues raised by Title II have not been resolved by its deletion from the Copyright Revision Bill. Therefore, the Committee believes that it will be necessary to reconsider the question of design protection in new legislation during the first session 95th Congress. At that time more complete hearings on the subject may be held and, without the encumbrance of a general copyright revision bill, the issues raised in Title II of S. 22 may be resolved." H.R.Rep. No. 1476, *supra,* at 50, 1976 U.S.Code Cong. & Ad.News at 5663.

In concluding that the two buckles were copyrightable we relied on the fact that "[t]he primary ornamental aspect of the Vaquero and Winchester buckles is conceptually separable from their subsidiary utilitarian function." *Id.* at 993. A glance at the pictures of the two buckles, reproduced at *id.* 995, coupled with the description in the text, confirms their highly ornamental dimensions and separability. What distinguishes those buckles from the Barnhart forms is that the ornamented surfaces of the buckles were not in any respect required by their utilitarian functions; the artistic and aesthetic features could thus be conceived of as having been added to, or superimposed upon, an otherwise utilitarian article. The unique artistic design was wholly unnecessary to performance of the utilitarian function. In the case of the Barnhart forms, on the other hand, the features claimed to be aesthetic or artistic, e.g., the life-size configuration of the breasts and the width of the shoulders, are inextricably intertwined with the utilitarian feature, the display of clothes. Whereas a model of a human torso, in order to serve its utilitarian function, must have some configuration of the chest and some width of shoulders, a belt buckle can serve its function satisfactorily without any ornamentation of the type that renders the *Kieselstein-Cord* buckles distinctive.[5]

The judgment of the district court is affirmed.

JON O. NEWMAN, Circuit Judge, dissenting:

This case concerns the interesting though esoteric issue of "conceptual separability" under the Copyright Act of 1976. Because I believe the majority has either misunderstood the nature of this issue or applied an incorrect standard in resolving the issue in this case, I respectfully dissent from the judgment affirming the District Court's grant of summary judgment for the defendant. I would grant summary judgment to the plaintiff as to two of the objects in question and remand for trial of disputed issues of fact as to the other two objects in question.

5. Our learned colleague, Judge Newman, would have copyrightability of a utilitarian article turn on "whether visual inspection of the article and consideration of all pertinent evidence would engender in the [ordinary] observer's mind a separate non-utilitarian concept that can displace, at least temporarily, the utilitarian aspect." (Dissenting Op. p. 423). The difficulty with this proposal is that it uses as its yardstick a standard so ethereal as to amount to a "non-test" that would be extremely difficult, if not impossible, to administer or apply. Whether a utilitarian object could temporarily be conceived of as a work of art would require a judicial investigation into the ways in which it might on occasion have been displayed and the extent of the displays. It might involve expert testimony and some kind of survey evidence, as distinguished from reliance upon the judge as an ordinary observer.

Almost any utilitarian article may be viewed by some separately as art, depending on how it is displayed (e.g., a can of Campbell Soup or a pair of ornate scissors affixed to the wall of a museum of modern art). But it is the object, not the form of display, for which copyright protection is sought. Congress has made it reasonably clear that copyrightability of the object should turn on its ordinary use as viewed by the average observer, not by a temporary flight of fancy that could attach to any utilitarian object, including an automobile engine, depending on how it is displayed.

The illusory nature of the standard suggested by Judge Newman is confirmed by his suggestion that under it some mannequins might qualify as copyrightable sculptures whereas others might not, depending on numerous factors, including the material used, the angular configuration of the limbs, the facial figures and the hair. Indeed, his uncertainty as to whether the styrene mannequin chests clothed with a shirt or blouse could be viewed by the ordinary observer as art only serves to underscore the bottomless pit that would be created by such a vague test. However, regardless of which standard is applied we disagree with the proposition that the mannequins here, when viewed as hollowed-out three dimensional forms (as presented for copyright) as distinguished from two-dimensional photographs, could be viewed by the ordinary observer as anything other than objects having a utilitarian function as mannequins. It would only be by concealing the open, hollowed-out rear half of the object, which is obviously designed to facilitate pinning or tucking in of garments, that an illusion of a sculpture can be created. In that case (as with the photos relied on by the dissent) the subject would not be the same as that presented for copyright.

The ultimate issue in this case is whether four objects are eligible for copyright protection. The objects are molded forms of styrene. Each is a life-size, three-dimensional representation of the front of the human chest. Two are chests of males, and two are chests of females. For each gender, one form represents a nude chest, and one form represents a chest clad with a shirt or a blouse.

Section 102(a)(5) of the Act extends copyright protection to "sculptural works," which are defined to include "three-dimensional works of fine, graphic, and applied art" and "works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned." 17 U.S.C. § 101 (1982). The definition of "sculptural works" contains a special limiting provision for "useful articles":

> the design of a useful article, as defined in this section, shall be considered a ... sculptural work only if, and only to the extent that, such design incorporates ... sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

*Id.* Each of the four forms in this case is indisputably a "useful article" as that term is defined in section 101 of the Act, 17 U.S.C. § 101 (1982), since each has the "intrinsic utilitarian function" of serving as a means of displaying clothing and accessories to customers of retail stores. Thus, the issue becomes whether the designs of these useful articles have "sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects" of the forms.

This elusive standard was somewhat clarified by the House Report accompanying the bill that became the 1976 Act. The Report states that the article must contain "some element that, *physically or conceptually,* can be identified as separable from the utilitarian aspects of that article." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 55, *reprinted in* 1976 U.S.Code Cong. & Ad. News 5668 (emphasis added). In this Circuit it is settled, and the majority does not dispute, that "conceptual separability" is distinct from "physical separability" and, when present, entitles the creator of a useful article to a copyright on its design. *See Kieselstein-Cord v. Accessories by Pearl, Inc.,* 632 F.2d 989, 993 (2d Cir.1980); *see also Trans-World Manufacturing Corp. v. Al Nyman & Sons, Inc.,* 95 F.R.D. 95, 98–99 (D.Del.1982); *but see Esquire, Inc. v. Ringer,* 591 F.2d 796, 803–04 (D.C.Cir. 1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979) (arguably rejecting the independent force of "conceptual separability").

What must be carefully considered is the meaning and application of the principle of "conceptual separability." [1] Initially, it

---

**1.** The principle of "conceptual separability" of functional design elements in copyright law should be distinguished from the somewhat similar principle of "functionality" as developed in trademark law. A design feature may not serve as a trademark protected by section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), if it is functional. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71 (2d Cir.1985); *Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327 (2d Cir.1983). For trademark purposes, a design feature has been said to be functional if it is "essential to the use or purpose of the article" or "affects the cost or quality of the article." *Inwood Laboratories, supra,* 456 U.S. at 850 n. 10, 102 S.Ct. at 2187 n. 10. Copyright law, however, does not deny copyright protection to a design simply because the design features are functional. If the design engenders a concept that is separable from the concept of the utilitarian function, the design is copyrightable. That is a reward for the special creativity shown by the designer of such an article. No comparable protection is warranted under trademark law since the marketer of the product with functional design features has available innumerable ways, other than these design features, to identify the source of his goods. He may use a distinctive trade name or trade dress or add distinctive non-functional design features. Any concern that copyright protection may accord a monopoly to advances in functional design, *see Warner Bros., supra,* 724 F.2d at 331 (explaining rationale for functionality defense in trademark law), is adequately met by confining the scope of copyright protection to the precise expression of the proprietor's design. Appellant is not seeking a copyright on the general form of a

may be helpful to make the obvious point that this principle must mean something other than "physical separability." That latter principle is illustrated by the numerous familiar examples of useful objects ornamented by a drawing, a carving, a sculpted figure, or any other decorative embellishment that could physically appear apart from the useful article. Professor Nimmer offers the example of the sculptured jaguar that adorns the hood of and provides the name for the well-known British automobile. *See* 1 *Nimmer on Copyright* § 2.08[B] at 2–96.1 (1985). With all of the utilitarian elements of the automobile physically removed, the concept, indeed the embodiment, of the artistic creation of the jaguar would remain. Since "conceptual separability" is not the same as "physical separability," it should also be obvious that a design feature can be "conceptually separable" from the utilitarian aspect of a useful article even if it cannot be separated physically.[2]

There are several possible ways in which "conceptual separability" might be understood. One concerns usage. An article used primarily to serve its utilitarian function might be regarded as lacking "conceptually separable" design elements even though those design elements rendered it usable secondarily solely as an artistic work. There is danger in this approach in that it would deny copyright protection to designs of works of art displayed by a minority because they are also used by a majority as useful articles. The copyright-

able design of a life-size sculpture of the human body should not lose its copyright protection simply because mannequin manufacturers copy it, replicate it in cheap materials, and sell it in large quantities to department stores to display clothing.

A somewhat related approach, suggested by a sentence in Judge Oakes' opinion in *Kieselstein-Cord,* is to uphold the copyright whenever the decorative or aesthetically pleasing aspect of the article can be said to be "primary" and the utilitarian function can be said to be "subsidiary." 632 F.2d at 993. This approach apparently does not focus on frequency of utilitarian and non-utilitarian usage since the belt buckles in that case were frequently used to fasten belts and less frequently used as pieces of ornamental jewelry displayed at various locations other than the waist. The difficulty with this approach is that it offers little guidance to the trier of fact, or the judge endeavoring to determine whether a triable issue of fact exists, as to what is being measured by the classifications "primary" and "subsidiary."

Another approach, also related to the first, is suggested by Professor Nimmer, who argues that "conceptual separability exists where there is any substantial likelihood that even if the article had no utilitarian use it would still be marketable to some significant segment of the community simply because of its aesthetic qualities." 1 *Nimmer, supra,* § 2.08[B] at 2–96.2 (foot-

molded chest serving the function of displaying clothes, only on the precise designs of the four forms in this lawsuit.

**2.** Professor Nimmer contends that the principle of "conceptual separability" is illustrated by the work deemed entitled to copyright in *Mazer v. Stein,* 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954). In that well-known decision, the Supreme Court upheld a copyright for the design of dancing figures used as the base of a lamp. This cannot be a case of "physical separability," Professor Nimmer maintains, because "[p]hysical removal of all utilitarian features of the lamp must include removal of its base," which would "hardly leave the sculptured dancer intact since the dancer *is* the base." 1 *Nimmer, supra,* § 2.08[B] at 2–96.1 (emphasis in origi-

nal). This may be so, but it is also arguable that the dancing figure, though functioning as the base, is not really essential to the utilitarian functioning of the lamp; only the wiring, the hollow metal stem enclosing the wiring (which was presumably encased in the figurine), the bulb socket, the bulb, and the switch were necessary to enable the object to function as a lamp. The dancing figure, though described in the opinion as a base, may really have been no more than a decorative enclosure for the stem, capable of physical separation from the functional elements of the lamp. Since *Mazer v. Stein* was decided before the principle of "conceptual separability" was explicitly identified as a criterion of copyrightability of the design of a useful article, it is not surprising that the Court's opinion does not illuminate the distinction between "physical" and "conceptual" separability.

note omitted). This "market" approach risks allowing a copyright only to designs of forms within the domain of popular art, a hazard Professor Nimmer acknowledges. *See id.* at 2–96.3. However, various sculpted forms would be recognized as works of art by many, even though those willing to purchase them for display in their homes might be few in number and not a "significant segment of the community."

Some might suggest that "conceptual separability" exists whenever the design of a form has sufficient aesthetic appeal to be appreciated for its artistic qualities. That approach has plainly been rejected by Congress. The House Report makes clear that, if the artistic features cannot be identified separately, the work is not copyrightable even though such features are "aesthetically satisfying and valuable." H.R. Rep. No. 1476, *supra,* at 55, 1976 U.S.Code Cong. & Ad.News at 5668. A chair may be so artistically designed as to merit display in a museum, but that fact alone cannot satisfy the test of "conceptual separateness." The viewer in the museum sees and apprehends a well-designed chair, not a work of art with a design that is conceptually separate from the functional purposes of an object on which people sit.

How, then, is "conceptual separateness" to be determined? In my view, the answer derives from the word "conceptual." For the design features to be "conceptually separate" from the utilitarian aspects of the useful article that embodies the design, the article must stimulate in the mind of the beholder a concept that is separate from the concept evoked by its utilitarian function. The test turns on what may reasonably be understood to be occurring in the mind of the beholder or, as some might say, in the "mind's eye" of the beholder. This formulation requires consideration of who the beholder is and when a concept may be considered "separate."

I think the relevant beholder must be that most useful legal personage—the ordinary, reasonable observer. This is the same person the law enlists to decide other conceptual issues in copyright law, such as

whether an allegedly infringing work bears a substantial similarity to a copyrighted work. *See, e.g., Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co.,* 509 F.2d 64 (2d Cir.1974); 3 *Nimmer, supra,* § 13.-03[E]. Of course, the ordinary observer does not actually decide the issue; the trier of fact determines the issue in light of the impressions reasonably expected to be made upon the hypothetical ordinary observer. And, as with other issues decided by reference to the reactions of an ordinary observer, a particular case may present undisputed facts from which a reasonable trier could reach only one conclusion, in which event the side favored by that conclusion is entitled to prevail as a matter of law and have summary judgment entered in its favor. *See, e.g., Kieselstein-Cord v. Accessories by Pearl, Inc., supra* (copyright proprietor prevails on issue of "conceptual separability" as a matter of law).

The "separateness" of the utilitarian and non-utilitarian concepts engendered by an article's design is itself a perplexing concept. I think the requisite "separateness" exists whenever the design creates in the mind of the ordinary observer two different concepts that are not inevitably entertained simultaneously. Again, the example of the artistically designed chair displayed in a museum may be helpful. The ordinary observer can be expected to apprehend the design of a chair whenever the object is viewed. He may, in addition, entertain the concept of a work of art, but, if this second concept is engendered in the observer's mind simultaneously with the concept of the article's utilitarian function, the requisite "separateness" does not exist. The test is not whether the observer fails to recognize the object as a chair but only whether the concept of the utilitarian function can be displaced in the mind by some other concept. That does not occur, at least for the ordinary observer, when viewing even the most artistically designed chair. It may occur, however, when viewing some other object if the utilitarian function of the object is not perceived at all; it may also occur, even when the utilitarian function is perceived by observation, per-

haps aided by explanation, if the concept of the utilitarian function can be displaced in the observer's mind while he entertains the separate concept of some non-utilitarian function. The separate concept will normally be that of a work of art.

Some might think that the requisite separability of concepts exists whenever the design of a form engenders in the mind of the ordinary observer any concept that is distinct from the concept of the form's utilitarian function. Under this approach, the design of an artistically designed chair would receive copyright protection if the ordinary observer viewing it would entertain the concept of a work of art in addition to the concept of a chair. That approach, I fear, would subvert the Congressional effort to deny copyright protection to designs of useful articles that are aesthetically pleasing. The impression of an aesthetically pleasing design would be characterized by many as the impression of a work of art, thereby blurring the line Congress has sought to maintain. I believe we would be more faithful to the Congressional scheme if we insisted that a concept, such as that of a work of art, is "separate" from the concept of an article's utilitarian function only when the non-utilitarian concept can be entertained in the mind of the ordinary observer without at the same time contemplating the utilitarian function. This temporal sense of separateness permits the designs of some useful articles to enjoy copyright protection, as provided by the 1976 Act, but avoids according protection to every design that can be appreciated as a work of art, a result Congress rejected. The utilitarian function is not truly a separate concept for purposes of "conceptual separateness" unless the design engenders a non-utilitarian concept without at the same time engendering the concept of a utilitarian function.

In endeavoring to draw the line between the design of an aesthetically pleasing useful article, which is not copyrightable, and the copyrightable design of a useful article that engenders a concept separate from the concept of its utilitarian function, courts will inevitably be drawn into some minimal

inquiry as to the nature of art. The need for the inquiry is regrettable, since courts must not become the arbiters of taste in art or any other aspect of aesthetics. However, as long as "conceptual separability" determines whether the design of a useful article is copyrightable, some threshold assessment of art is inevitable since the separate concept that will satisfy the test of "conceptual separability" will often be the concept of a work of art. Of course, courts must not assess the *quality* of art, but a determination of whether a design engenders the concept of a work of art, separate from the concept of an article's utilitarian function, necessarily requires some consideration of whether the object *is* a work of art.

Both the trier determining the factual issue of "conceptual separability" and the judge deciding whether the undisputed facts permit a reasonable trier to reach only one conclusion on the issue are entitled to consider whatever evidence might be helpful on the issue, in addition to the visual impressions gained from the article in question. Thus, the fact that an object has been displayed or used apart from its utilitarian function, the extent of such display or use, and whether such display or use resulted from purchases would all be relevant in determining whether the design of the object engenders a separable concept of a work of art. In addition, expert opinion and survey evidence ought generally to be received. The issue need not turn on the immediate reaction of the ordinary observer but on whether visual inspection of the article and consideration of all pertinent evidence would engender in the observer's mind a separate non-utilitarian concept that can displace, at least temporarily, the utilitarian concept.

This approach seems consistent with and may even explain the few cases to have considered the issue, although the language in all of the decisions may not be entirely reconcilable. In *Kieselstein-Cord*, we upheld the copyrightability of the artistic design of two belt buckles. This holding was based upon a conclusion that the

design of the buckles was conceptually separate from the utilitarian function of fastening a belt. That view, in turn, was based in part on the undisputed fact that consumers with some frequency wore the buckles as ornamental jewelry at locations other than the waist. The Court apparently concluded that the buckles had created in the minds of those consumers a conception of the design as ornamental jewelry separate from the functional aspect of a belt buckle. Expert testimony supported the view that the buckles "rise to the level of creative art." 632 F.2d at 994. The case was characterized by Judge Oakes as "on a razor's edge of copyright law," *id.* at 990, as indeed it was; some might have thought that even though some consumers wore the buckle as ornamental jewelry, they still thought of the article as a belt buckle, albeit one so artistically designed as to be appropriate for wearing elsewhere than at the waist. Whether the concept in the mind of the ordinary observer was of a piece of ornamental jewelry separate from the concept of a belt buckle, or only the concept of a belt buckle that could be used either to fasten a belt or decorate clothing at any location was undoubtedly a close question.

In *Trans-World Manufacturing Corp.,* *supra,* the interesting design of a display case for eyeglasses was deemed to create for the trier of fact a fair question as to whether a concept separable from the utilitarian function existed. By contrast, the designs of the wheel cover in *Norris Industries v. I.T. & T.,* 696 F.2d 918 (11th Cir.), *cert. denied,* 464 U.S. 818, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983), and the outdoor lighting fixture in *Esquire, Inc. v. Ringer,* *supra,* were each deemed, as a matter of

law, to engender no concept that was separable from the utilitarian function of each article. It evidently was thought that an ordinary observer viewing the articles would have in mind no conception separate from that of a wheel cover (*Norris*) or a lighting fixture (*Esquire*).

Our case involving the four styrene chest forms seems to me a much easier case than *Kieselstein-Cord.* An ordinary observer, indeed, an ordinary reader of this opinion who views the two unclothed forms depicted in figures 1 and 2 below, would be most unlikely even to entertain, from visual inspection alone, the concept of a mannequin with the utilitarian function of displaying a shirt or a blouse. The initial concept in the observer's mind, I believe, would be of an art object, an entirely understandable mental impression based on previous viewing of unclad torsos displayed as artistic sculptures. Even after learning that these two forms are used to display clothing in retail stores, the only reasonable conclusion that an ordinary viewer would reach is that the forms have both a utilitarian function and an entirely separate function of serving as a work of art. I am confident that the ordinary observer could reasonably conclude only that these two forms are not simply mannequins that happen to have sufficient aesthetic appeal to qualify as works of art, but that the conception in the mind is that of a work of art *in addition to and capable of being entertained separately from* the concept of a mannequin, if the latter concept is entertained at all. As appellant contends, with pardonable hyperbole, the design of Michelangelo's "David" would not cease to be copyrightable simply because cheap copies of it were used by a retail store to display clothing.

 

Figure 1     Figure 2

This is not to suggest that the design of every form intended for use as a mannequin automatically qualifies for copyright protection whenever it is deemed to have artistic merit. Many mannequins, perhaps most, by virtue of the combination of the material used, the angular configuration of the limbs, the facial features, and the representation of hair create the visual impression that they are mannequins and not anything else. The fact that in some instances a mannequin of that sort is displayed in a store as an eye-catching item apart from its function of enhancing the appearance of clothes, in a living room as a conversation piece, or even in a museum as an interesting example of contemporary industrial design does not mean that it engenders a concept separate from the concept of a mannequin. The two forms depicted in figures 1 and 2, however, if perceived as mannequins at all, clearly engender an entirely separable concept of an art object, one that can be entertained in the mind without simultaneously perceiving the forms as mannequins at all.

The majority appears to resist this conclusion for two reasons. First, the majority asserts that the appellant is seeking application of a lower level of scrutiny on the issue of copyrightability because the forms depict a portion of the human body. I do not find this argument anywhere in the appellant's briefs. In any event, I agree with the majority that no lower level of scrutiny is appropriate. But to reject a lower level is not to explain why appellant does not prevail under the normal level. Second, the majority contends that the design features of the forms are "inextricably intertwined" with their utilitarian function. This intertwining is said to result from the fact that a form must have "some configuration of the chest and some width of shoulders" in order to serve its utilitarian function. With deference, I believe this approach misapplies, if it does not ignore, the principle of "conceptual separability." Of course, the design features of these forms render them suitable for their utilitarian function. But that fact only creates the issue of "conceptual separability"; it does not resolve it. The question to be decided is whether the design features of these forms create in the mind of an ordinary viewer a concept that is entirely separable from the utilitarian function. Unlike a form that always creates in the observer's mind the concept of a mannequin, each of these unclothed forms creates the separate concept of an object of art—not just an aesthetically pleasing mannequin, but

**426**

an object of art that in the mind's eye can be appreciated as something other than a mannequin.

Of course, appellant's entitlement to a copyright on the design of the unclothed forms would give it only limited, though apparently valuable, protection. The copyright would not bar imitators from design-

ing human chests. It would only bar them from copying the precise design embodied in appellant's forms.

As for the two forms, depicted in figures 3 and 4 below, of chests clothed with a shirt or a blouse, I am uncertain what concept or concepts would be engendered in the mind of an ordinary observer.

Figure 3

Figure 4

I think it is likely that these forms too would engender the separately entertained concept of an art object whether or not they also engendered the concept of a mannequin. But this is not the only conclusion a reasonable trier could reach as to the perception of an ordinary observer. That observer might always perceive them as mannequins or perhaps as devices advertising for sale the particular style of shirt or blouse sculpted on each form.[3] I think a reasonable trier could conclude either way on the issue of "conceptual separability" as to the clothed forms. That issue is therefore not amenable to summary judgment and should, in my view, be remanded for trial. In any event, I do not agree that the only reasonable conclusion a trier of fact could reach is that the clothed forms create

no concept separable from the concept of their utilitarian function.

I would grant summary judgment to the copyright proprietor as to the design of the two nude forms and remand for trial with respect to the two clothed forms.

---

**3.** If the concepts always engendered in the mind of an ordinary observer were that of a mannequin to display sweaters or accessories on top of the shirt or blouse, or of a form to advertise the

style of the sculpted shirt or blouse itself, these utilitarian functions would not, in the absence of some separable concept, support a copyright in the design of the clothed forms.