Forest HART, Sculptor, Thomas Ray d/b/a Hartforms, Archie Phillips, Research Mannikins, Joseph M. Kish, formerly doing business as Rocky Mountain Forms, Jim Allred Taxidermy Supply, Foster Taxidermy Supply, Martin Industries, Matt Thompson Taxidermy and Supply, SCR Corporation d/b/a Jonas Supply Company, Precision Mannikins, Inc., Joe Coombs Classics, Inc., Plaintiffs,

v.

DAN CHASE TAXIDERMY SUPPLY COMPANY, INC., Defendant.

Civ. No. 93–CV–345.

United States District Court,
N.D. New York.

May 17, 1995.

Hancock & Estabrook, Syracuse, NY (Michael Oropallo, of counsel), for plaintiffs.

Trapani & Molldrem, Syracuse, NY (Bernhard Molldrem, of counsel), for defendant.

## *AMENDED DECISION AND ORDER* [1]

SCULLIN, District Judge.

### INTRODUCTION

Presently before the Court is the issue of whether various animal mannequins are copyrightable under The Copyright Act, 17 U.S.C. § 101 *et seq.* This issue arises out of

---

1. This Order amends a previously issued May 5, 1995 Order by adding an introduction.

an action commenced on March 12, 1993 alleging copyright infringement, Lanham Acts violations, an accounting, unfair competition, plagiarism, fraud and misrepresentation, and violations of various state "direct molding" statutes with regard to over 300 animal mannequins. After an answer was served and various procedural issues were resolved, the parties cross moved for summary judgment. On October 13, 1994, the Court denied the cross motions for summary judgment holding that for purposes of the motion the mannequins at issue were copyrightable and that there were genuine issues of material fact as to whether the allegedly infringing mannequins were substantially similar to plaintiffs' forms.

On November 7, 1994, the parties stipulated to initially litigate the copyright claims as to 36 "representative" animal mannequins and thereafter, if necessary, litigate the claims as to the remaining mannequins.

Trial was set for May 1, 1995, at which time the Court decided to revisit the issue of copyrightability as to the 36 mannequins. The Court held a hearing May 1–3, 1995, to determine whether the animal mannequins [2] were copyrightable and therefore subject to copyright protection.[3] The resolution of that issue follows.

## FACTS

Plaintiffs are taxidermy supply companies that create and sell plastic animal mannequins used by taxidermists to mount animal skins. In order to create the mannequins, the plaintiffs initially build an armature or base to serve as a framework from which the plaintiffs sculpt a model. The armature or base is usually built around an actual skeleton, a wood skeleton, or a combination of the two. Clay is then applied to the armature to develop the sculptured model. The model is designed with as much detail as the sculptor sees fit, including gesture, pose, muscle structure and skin wrinkles. The clay model is then used to develop a fiberglass mold or separator. The fiberglass separator is then injected with lightweight plastic (polyurethane) to produce mannequins that resemble the model, including its size, shape and posture.

Defendant, also a maker and seller of animal mannequins, sometimes uses an existing mannequin as an armature and develops his mannequins around it.

## DISCUSSION

## I. COPYRIGHTABILITY OF THE SUBJECT MATTER

The U.S. Copyright Office has issued copyright registrations for plaintiffs' animal mannequins and accordingly plaintiffs are entitled to a presumption of copyright protection. The Copyright Act, 17 U.S.C. § 410(c).[4] Therefore defendant has the burden of proving that the copyrights are invalid. *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 414 (2d Cir.1985).

Even though the plaintiffs are entitled to a presumption as to copyrightability, the Court must still look to the statute to see the extent to which the protection may apply.

Plaintiffs registered their copyrights as "pictorial, graphic, and sculptural works." The Copyright Act, 17 U.S.C. § 102(a)(5). The Copyright Act defines such works to "include two-dimensional and three-dimensional works of fine, graphic, and applied art, ... diagrams, models ... [and that] such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned." The Copyright Act, 17 U.S.C. § 101.

In contrast to pictorial, graphic, and sculptural works, there is generally no copyright protection for "useful articles," which are

---

**2.** The parties had stipulated to try the copyright claims as to 36 forms, but through circumstances not relevant here, plaintiffs are proceeding with only 30 forms.

**3.** The parties maintain and the Court agrees that the question of "copyrightability" is a question of law for the Court to decide.

**4.** The court has exercised its discretion to grant the presumption to those registrations made after five years of first publication of the work. The Copyright Act, 17 U.S.C. § 410(c).

defined as "article[s] having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." However, useful articles will "be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." The Copyright Act, 17 U.S.C. § 101.

Therefore, the Court, in deciding the copyrightability of the 30 animal mannequins, must first determine whether the animal mannequins are indeed pictorial, graphic and sculptural works or are useful articles. Further, if they are useful articles the Court must determine whether there are any separable artistic aspects. *Superior Form Builders v. Dan Chase Taxidermy Supply Co., Inc.*, 851 F.Supp. 222, 223 n. 3 (E.D.Va.1994); *Brandir Int'l, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142, 1144 (2d Cir.1987); *Carol Barnhart Inc v. Economy Cover Corp.*, 773 F.2d 411 (2d Cir.1985).

### A. Pictorial, Graphic, and Sculptural Works or Useful Articles

■ Both parties agree that the animal mannequins are primarily used for taxidermy mounts,[5] and thus provide a use or function—to display animal skins. However, plaintiffs claim that the mannequins are works of artistic creation which realistically and anatomically portray the appearance of animals as conceptualized by the sculptor. Defendant claims that the mannequins are merely tools for the taxidermist.[6]

Animal mannequins used for taxidermy present the unique problem of not fitting neatly into any specific definition set forth in the Copyright Act. In one sense the mannequins serve to portray the appearance of the animal. In another sense, the mannequins serve to aid the skin mounting process. However, merely because the forms can be used by taxidermists to mount skins does not mean that the mannequins are "useful articles" as that term is defined in The Copyright Act, 17 U.S.C. § 101. Testimony at the hearing confirms plaintiffs' argument that the sculptors' intent and purpose in creating the animal mannequins at issue was to make lifelike forms and to capture his or her individual perception of the animals. Additionally, the defendant and his expert admit that a taxidermist buys a mannequin which expresses the pose, attitude and appearance of the animal that will satisfy his or her customer.[7] Viewed in this manner, animal mannequins used for taxidermy generally would not be "useful articles" as that term is used in The Copyright Act. The Court therefore concludes that the "usefulness" of most animal mannequins is to portray a specific appearance. *See Superior Form Builders v. Dan Chase Taxidermy Supply Co., Inc.*, 851 F.Supp. 222, 223 n. 3 (E.D.Va.1994); *see also Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663 (3d Cir.1990) (pig nose masks were not useful articles).[8] That does not, however, foreclose some animal mannequins from coming within the definition of useful articles.

### B. Separability

■ Assuming arguendo that some animal mannequins used for taxidermy are "useful articles," further analysis is then required to determine copyrightability. A useful article may still be copyrightable as a sculptural

5. There has also been testimony that the mannequins have been exhibited as art and used as anatomical references by other artists.

6. The defendant also maintains that the animal mannequins' purpose is to make the mount look as lifelike and anatomically correct as possible. By pressing this position the defendant appears to be conceding that the mannequins' purpose is to "portray the appearance of the article" which would support the conclusion that the mannequins are not useful articles as defined by the copyright law.

7. The defendant also produced an accomplished sculptor as an expert who testified that the mannequins at issue were not "art" because they were not complete. The Court believes that definition of "art" is unacceptably narrow for purposes of copyrightability.

8. The Court notes that the animal mannequins in this case are distinguishable from the human torsos in *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411 (2d Cir.1985).

work, "to the extent that [the design of a useful article] incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." The Copyright Act, 17 U.S.C. § 101. Although separability encompasses both physical separability and conceptual separability, we deal with conceptual separability here. *See Brandir Int'l, Inc. v. Cascade Pacific Lumber Co.,* 834 F.2d 1142, 1144 (2d Cir.1987).

While conceptual separability is an elusive concept, the Second Circuit has attempted to set forth a workable test to aid in the determination. "[I]f design elements reflect a merger of aesthetic and functional considerations, the artistic aspects of a work cannot be said to be conceptually separable from the utilitarian elements. Conversely, where design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences, conceptual separability exists." *Brandir,* 834 F.2d at 1142 (2d Cir.1987).

Assuming that the mannequins' function is to mount skins,[9] the Court's inquiry must focus on whether there are elements of the mannequins that reflect "artistic expression uninhibited by functional considerations." *Id.* at 1145. The Court finds that many animal mannequins do exhibit such elements. The function of mounting skins can be accomplished by almost any crude form that is generally the proper size for the skin. Thus, an amorphous, undefined lump of foam would suffice to perform the function of mounting skins. However many animal mannequins contain an undeniable artistic element—the artists' expression of a lifelike animal.

Part of each mannequin is the artists' conception of what the animal is doing and how that animal would appear while doing that activity. Thus the gestures, pose, attitude, muscle structure and skin wrinkles all represent the artists' expression of the particular animal, and, most importantly, are not required by or do not aid the function of mounting skin. Choosing one pose, attitude, gesture, muscle structure or skin wrinkle over another is not done to "accommodate and further" skin mounting; rather the choice "reflect[s] the designer's artistic judgment exercised independently of functional influences." *Id.* at 1145. Indeed plaintiffs have testified that they will often forsake strict anatomical accuracy to achieve a particular look or concept. For example one sculptor testified that he made the body of an elk mannequin shorter to give the whole form the appearance of a square, a characteristic that sculptor believed was more appealing to the eye. Changes were made to other mannequins to portray a particular shape, to express an emotion or attribute, to inspire a particular feeling in the viewer, or simply to cast shadows in a particular way. These goals are not constrained by, and in fact are divorced from, the functional consideration of applying animal skin to the mannequin.[10] Therefore, there are artistic aspects of many of these mannequins that are conceptually separable and distinct from the function of mounting skin.

## II. MERGER DOCTRINE

Finding that particular mannequins are pictorial, graphic and sculptural works or that they have separable artistic elements does not seal their fate as copyrightable works. There is another concept that impacts copyrightability—the concept of merger between idea and expression.

■ The Copyright Act § 102(b) provides: "In no case does copyright protection for an

---

**9.** Obviously arguments can be, and have been, made as to what is the function of the mannequins. If the function is to mount skins, it is clear that artistic elements exist separately from the functional considerations. If the function is to give the appearance of a lifelike animal, then all the artistic parts further the function. However, in that case the mannequin would not fit the definition of useful article because its function would be to merely portray the appearance of the article.

**10.** To this extent the mannequins are distinguishable from the bike rack discussed in *Brandir.* There, the sculpture was adapted to better serve as a bike rack. Here the sculpture is not adapted to facilitate skin mounting, but is created to reflect the artist's expression. *See Brandir,* 834 F.2d at 1145–47.

original work of authorship extend to any idea ... regardless of the form in which it is described, explained, illustrated, or embodied in such work." This fundamental principle that "only the expression of an idea and not the idea itself is protectible ... has produced a corollary maxim that even expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." *Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir.1991). This doctrine "is designed to prevent an author from monopolizing an idea merely by copyrighting a few expressions of it." *Toro Co. v. R & R Prods. Co.*, 787 F.2d 1208, 1212 (8th Cir.1986). Thus where there are only a few ways of expressing an idea, the expression is said to merge with the idea, making the expression, as well as the idea that engendered it, non-copyrightable.

While some courts consider this issue as a defense to whether there has been an infringement of protectible expression, that is, as a way of negating substantial similarity; other courts treat this issue as a fundamental part of whether a work is merely an idea and not copyrightable. *See generally Kregos*, 937 F.2d 700 (citing cases). The practical result is the same—the Court determines as a matter of law whether the idea and the expression merge so as to preclude copyright protection. *Kregos*, 937 F.2d at 705; *Kern River Gas Transmission Co. v. Coastal Corp.*, 899 F.2d 1458, 1463–64 (5th Cir.), *cert. denied*, 498 U.S. 952, 111 S.Ct. 374, 112 L.Ed.2d 336 (1990).

Stating the issue, however, is easier than resolving it. "Determining when the idea and its expression have merged is a task requiring considerable care: if the merger doctrine is applied too readily, arguably available alternative forms of expression will be precluded; if applied too sparingly, protection will be accorded to ideas." *Kregos*, 937 F.2d at 705. The difference between an idea and its expression is often a matter of degree. Thus it has been said that "[n]o principle can be stated as to whether an imitator has gone beyond the idea and has borrowed its expression." *Peter Pan Fab-*

*rics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960) (Hand, J.). "The guiding consideration in drawing the line [between an idea and its expression] is the preservation of the balance between competition and protection reflected in the patent and copyright laws." *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir.1971).

Therefore, because the merger doctrine impacts copyrightability, the Court will have to consider this issue along with the other issues of copyrightability.

## III. THE ANIMAL MANNEQUINS AT ISSUE IN THIS CASE

With all these principles in mind, the Court can turn to the 30 animal mannequins at issue here and determine whether they are copyrightable. The mannequins can be divided into three groups: fish, full body animal, and animal head and shoulders.

The fish category consists of:[11] P–123 (bass); P–124 (bass); P–125 (bass); P–137 (trout); P–138 (trout); P–148 (crappie/perch); P–149 (bream/bluegill/sunfish); P–150 (bream/bluegill/sunfish).

The full body animal category consists of: P–120 (standing bear); P–121 (leopard); P–122 (female mountain lion); P–128 (sheep); P–129 (bobcat); P–130 (coyote); P–133 (buffalo/bison); P–134 (black bear); P–144 (woodchuck); P–145 (raccoon); P–146 (badger); P–152 (elk); P–154 (leaping deer).

The animal head and shoulders category consists of: P–132 (moose head); P–136 (sheep head); P–140 (deer head, "sneak" position); P–141 (deer head, turning left); P–142 (deer head, turning toward shoulder); P–153 (long-horn steer head); P–156 (pronghorn antelope); P–157 (deer head, downward); P–158 (deer head).

■ The Court holds that the fish mannequins at issue here exemplify the merger of idea and expression. After a careful review of all the fish mannequins at issue here, the Court can see no meaningful detail in the mannequins that is not commanded by the idea of a realistic fish. The plaintiffs testi-

---

**11.** References are to plaintiffs' exhibit numbers.

fied that different "attitudes" in a fish mannequin are conveyed by the openness of the mouth, and by the position of the body, fins and tail. Here, however, the fish mannequins have no real head, fins, gills or tail; they consist simply of the body of the fish. Although the fish bodies can be contorted to take on different shapes and postures, given their lack of detail, they confess of only of a limited amount of expression. It should be noted that the fish mannequins in this case all represented relatively small fish, such that without a head, fins, gills or tail, they could exhibit only a limited range of motion, and thus limited expression. In other words, because there are only a few ways in which to express the idea of a realistic fish body in a mannequin, the expression merges with the idea. Therefore the Court holds that even if the fish mannequins are sculptural works or have artistic separable parts, the fish mannequins, P–123 (bass); P–124 (bass); P–125 (bass); P–137 (trout); P–138 (trout); P–148 (crappie/perch); P–149 (bream/bluegill/sunfish); P–150 (bream/bluegill/sunfish), are not copyrightable.

■ With regard to the full-body animal mannequins and the animal head and shoulder mannequins, the Court holds that the function of the mannequins is merely to portray the appearance of the animal and therefore the mannequins are copyrightable as sculptural works. In the alternative, the Court holds that even if the function of the full-body animal mannequins and the animal head and shoulder mannequins is to mount skins, the pose, attitude, gesture, muscle structure, facial expression and skin wrinkles of those mannequins are separable artistic parts. Those characteristics are added to each mannequin not to accommodate and further skin mounting, but to represent the particular sculptor's perception of the animal. Further, the plaintiffs testified that in some instances changes are made to the anatomical accuracy of the mannequins to achieve a particular look or concept. Those attributes "reflect the designer's artistic judgment exercised independently of functional influences." *Brandir*, 834 F.2d 1142, 1145 (2d Cir.1987). Therefore, the Court holds that the full-body animal mannequins, P–120 (standing bear); P–121 (leopard); P–122 (female mountain lion); P–128 (sheep); P–129 (bobcat); P–130 (coyote); P–133 (buffalo/bison); P–134 (black bear); P–144 (woodchuck); P–145 (raccoon); P–146 (badger); P–152 (elk); P–154 (leaping deer), and the animal head and shoulders mannequins, P–132 (moose head); P–136 (sheep head); P–140 (deer head, "sneak" position); P–141 (deer head, turning left); P–142 (deer head, turning toward shoulder); P–153 (long-horn steer head); P–156 (pronghorn antelope); P–157 (deer head, downward); P–158 (deer head), are copyrightable.

At this point, to aid the parties in preparing for trial, it is worth identifying the burden of proof the plaintiffs have with respect to proving substantial similarity.

Substantial similarity is not a fixed standard, but instead is represented by a sliding scale: The less ways there are to express an idea the more substantial the similarities must be; conversely, the more ways to express an idea the less substantial the similarities must be. Thus, when the idea and expression do not merge, but there is still only a limited number of ways of expressing the idea, "the burden of proof is heavy on the plaintiff who may have to show 'near identity' between the works at issue." *Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606–07 (1st Cir. 1988); *See, e.g., Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1507 (9th Cir.1987) (" '[I]ndispensable expression' of ideas may be protected only against virtually identical copying."); *Gund, Inc. v. Smile Int'l, Inc.*, 691 F.Supp. 642, 645 (E.D.N.Y.1988), *aff'd*, 872 F.2d 1021 (2d Cir.1989) (" '[I]ndispensable expression' of a generalized idea may be protected only against virtually identical copying."); *Harvey Cartoons v. Columbia Pictures Indus.*, 645 F.Supp. 1564, 1571 n. 9 (S.D.N.Y.1986) (When there are only limited ways of expressing an idea "only exact copying is infringement."); *Past Pluto Productions v. Dana*, 627 F.Supp. 1435, 1444 (S.D.N.Y.1986) ("To the extent that an idea and its expression are indistinguishable, a copyright can protect only against identical copying."). "This showing is necessary because, as idea and expression merge, fewer and fewer aspects of the work embody a

78

unique and creative expression of the idea; a copyright holder must then prove substantial similarity to those few aspects of the work that are expression not required by the idea." *Concrete Machinery,* 843 F.2d at 607.

In *Concrete Machinery* the court stated:

As an example in the case before us, appellant has a copyright in a design of concrete "life size deer." The idea behind this particular expression can be briefly described as a "realistic-looking concrete deer." Appellant cannot prohibit others from appropriating this idea; it can, however, prohibit any actual copying of its own version of a "realistic-looking concrete deer." Yet, it has a problem of proof: because the statue is a detailed replica of a real deer, the real deer, in essence, supplied most of the features which any subsequent artist can also take from the real deer. To prove copying, then, Concrete must show substantial similarity, between works, in those features over which it exercised discretion while portraying a "realistic-looking concrete deer." These features include such aspects as pose, posture, and facial expression.

*Id.*

This case presents similar problems as to proof, and, accordingly the jury will be instructed regarding the sliding scale of substantial similarity.

Therefore it is hereby

ORDERED that plaintiffs' mannequins: P–123; P–124; P–125; P–137; P–138; P–148; P–149; P–150 are not copyrightable and the copyright claims are DISMISSED as to these mannequins; and it is further

ORDERED that plaintiffs' mannequins: P–120; P–121; P–122; P–128; P–129; P–130; P–133; P–134; P–144; P–145; P–146; P–152; P–154; P–132; P–136; P–140; P–141; P–142; P–153; P–156; P–157; P–158 are copyrightable.

**IT IS SO ORDERED.**