**ELLISON EDUCATIONAL EQUIPMENT, INC., a California corporation, Plaintiff,**

v.

**ACCU–CUT SYSTEMS, INC., a Nebraska corporation; and Steven Nabity, an individual, Defendants.**

No. CV. 90–0–833.

United States District Court, D. Nebraska.

March 13, 1991.

**1092**

C.L. Robinson, Fitzgerald, Schorr, Barmettler & Brennan, Omaha, Neb., James E. Hawes, Hawes & Fischer, Margie R. Dickinson, Newport Beach, Cal., for plaintiff.

Michael J. Pankow, Michael A. Nelsen, Dixon & Dixon P.C., Omaha, Neb., for defendants.

## MEMORANDUM OPINION

STROM, Chief Judge.

This matter is before the Court on Ellison Educational Equipment, Inc.'s (hereinafter "Ellison") request for preliminary injunctive relief (Filing No. 2). Ellison filed this action alleging copyright infringement arising under 17 U.S.C. §§ 101, *et seq.;* false designation of origin and unfair competition arising under the trademark laws, 15 U.S.C. §§ 1051, *et seq.;* and unfair methods of competition and unfair or deceptive acts and practices in violation of the common law of Nebraska, the Consumer Protection Act, Neb.Rev.Stat. §§ 59–1601 through 59–1622, and the Uniform Deceptive Trade Practices Act, Neb.Rev.Stat. §§ 87–301 through 87–306. The Court conducted a hearing on Ellison's request for preliminary injunctive relief on February 11, 1991. This Court has jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338.

## FACTS

Ellison seeks preliminary injunctive relief against Accu–Cut Systems, Inc., and Steven Nabity (hereinafter collectively referred to as "Accu–Cut") to enjoin Accu–Cut's practices which Ellison alleges infringes on its trademark and copyright rights and constitute unfair competition. Defendant Steven Nabity is one of the founders of defendant Accu–Cut Systems, Inc., a Fremont, Nebraska, based firm founded in 1990 consisting of four individuals.

Ellison is actively engaged in the design, manufacture, promotion and sale of paper die punch machines, dies, and various related items. The machines and dies are marketed to educational systems as a means for producing paper cutouts in the form of letters and decorative figures for the use in, for example, lessons and bulletin board displays (Filing No. 30, ¶ 2). The Ellison paper die punch machine is sold under the name "Ellison Letter Machine" and is a hand-levered, steel-ruled, die cutter that stamps out letters and decorative designs. The die, similar to a cookie cutter, is a steel-ruled blade imbedded in a five-by-six inch (5″ × 6″) piece of plywood with foam rubber surrounding the blade to protect the user's fingers and to eject the paper figure after cutting. To operate, the user slides the die and some paper into the machine, pulls down the handle and removes the die and paper to retrieve the paper cutout. The Ellison Letter Machine costs approximately $300 and the cost of the dies range from $20 to $90 each (Filing No. 30, ¶ 7). Ellison began activity as a business in approximately March, 1977 (Exhibit 1, 5:6–5:20). Ellison has sold approximately twenty thousand (20,000) machines to date and has developed into a small privately held corporation located in Irvine, California, with approximately forty-five (45) employees (Filing No. 30, ¶ 6).

Accu–Cut was founded in 1990 and has designed and markets a roller cutting machine which also produces paper cutouts in the form of letters and decorative shapes. Accu–Cut's roller cutting machine can utilize dies of various sizes which can cut out shapes up to eight inches by ten inches (8″ by 10″) and borders up to ten inches (10″) high and seventeen inches (17″) long (Exhibit 6). Accu–Cut sells its roller cutting machine for $249 but offers a $25 discount on the purchase of the machine if the purchaser submits a coupon along with one cutout shape from an Ellison machine (Exhibit O).[1] Accu–Cut's dies range in price from $30 to $125.[2] Since its inception, Accu–Cut's total sales as of December 31, 1990, were $15,802.86 (Exhibit P).

Ellison currently sells over five hundred (500) different designs and Accu–Cut sells approximately two hundred twenty-five (225) designs including approximately one hundred ten (110) decorative designs. Ellison claims trademark and copyright protection in forty-seven (47) various designs currently marketed by Accu–Cut. The designs in which Ellison claims protection consist of an acorn, apple, book, witch, woman, Cupid, lightning bolt, house, kite, George Washington, sun, four-leaf clover, shamrock, banana, boy, egg, football helmet, horse, Halloween cat, angel, award, dog bone, teddy bear, birthday cake, turkey, light bulb, leaf, ghost, umbrella, strawberry, school house, railroad car, cactus, football, happy face, school bus, raindrops, Halloween jack-o-lantern, space shuttle, tepee, sleigh, sailboat, megaphone, duck, Abe Lincoln, and girl (Filing No. 30, Exhibit 17).[3] Ellison also claims that

---

**1.** At the hearing on Ellison's request for preliminary injunctive relief, James Nichols testified that the discount coupon required the submission of an Ellison cutout shape in order to verify that the purchaser had an Ellison machine. Nichols testified that Accu–Cut marketed to Ellison customers in this fashion because Accu–Cut's roller cutting machine could utilize not only the larger Accu–Cut dies, but also the Ellison dies which were approximately half the size of Accu–Cut dies. Therefore, it was felt that

current Ellison customers would constitute a desirable market.

**2.** The "Santa" die, # S1100, is sold by Accu–Cut for $125 (Exhibit 6).

**3.** The Court notes that, although the parties refer to forty-seven (47) different shapes as being in issue, Filing No. 30, Exhibit 17 sets forth a comparison of only forty-six (46) designs. For

Accu–Cut is attempting to appropriate the "Ellison" name and a "no scissors" logo which consists of an international "no" sign ("circle/slash") covering a pair of scissors. Ellison claims that the "no scissors" logo is its trademark and that the logo was adopted by Ellison as early as 1985. Ellison further alleges that Accu–Cut has made misrepresentations concerning Ellison's products and that Accu–Cut has improperly attempted to hire Ellison employees.

## DISCUSSION

■ Ellison filed its complaint seeking injunctive relief. The extraordinary remedy of injunctive relief may be granted if the moving party demonstrates (1) that it is threatened with irreparable harm; (2) that this harm outweighs any injury which granting the injunction will inflict on other parties; (3) that the movant will probably succeed on the merits; and (4) that the public interest favors an injunction. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc). No single factor in itself is dispositive. In each case all the factors must be considered to determine whether on balance they weigh towards granting the injunction. *Id.* The burden on a movant to demonstrate that a preliminary injunction is warranted is heavier when, as here, granting the preliminary injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 503 (8th Cir.1987).

### A. Trademark Claims

Ellison asserts trademark protection in its name, in its designs, and in its no-scissors logo. The elements relating to the false designation of origin and unfair competition claims arising under the federal trademark laws, and those alleged infringements arising under state law, are essentially the same. Ellison must show that it owns a protectable trademark and that Accu–Cut has used, in commerce, a similar mark that is likely to cause confusion. *See Mutual of Omaha Ins. Co. v. Novak*, 648 F.Supp. 905, 909 (D.Neb.1986), *aff'd*, 836 F.2d 397 (8th Cir.1987), *cert. denied*, 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988). To establish that it has a protectable trademark, Ellison must show that its products have acquired nonfunctional features and that these features have acquired secondary meaning. *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1217–21 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). Concerning trademarks, 15 U.S.C. § 1125(a), prohibits as unfair competition any "false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same." The Nebraska Uniform Deceptive Trade Practices Act prohibits deceptive trade practices including those practices causing a "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services." Neb. Rev.Stat. § 87–302(a)(2).[4]

■ Trademark is defined as follows:

---

the purposes of this opinion, the Court finds such discrepancy not to be relevant.

**4.** Ellison has also included a claim arising under the Nebraska Consumer Protection Act which states in part that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful." Neb.Rev.Stat. § 59–1602 (Reissue 1988). Further, Neb.Rev.Stat. § 59–1603 provides that "[a]ny contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful."

The Consumer Protection Act is essentially the state version of the Sherman Antitrust Act. *See State ex rel. Douglas v. Associated Grocers of Nebraska Cooperative, Inc.*, 214 Neb. 79, 83, 332 N.W.2d 690, 692–93 (1983). At the hearing on Ellison's request for preliminary injunctive relief, the parties confined their arguments to the various claims arising under the trademark and copyright laws. As there is currently no evidence before the Court relating to a conspiracy in violation of the Consumer Protection Act, the Court will for the purposes of this opinion confine its review to the trademark and copyright infringement claims.

The term "trademark" includes any word, name, symbol, or device, or any combination thereof—

> (1) used by a person, or
>
> (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown. 15 U.S.C. § 1127. Only distinctive marks are entitled to protection. In determining whether a mark is entitled to protection, courts have employed several approaches including the categorization of the mark as either generic, descriptive, suggestive, or arbitrary. *Co–Rect Products v. Marvy! Advertising Photography*, 780 F.2d 1324, 1329 (8th Cir.1985). A generic mark is one that refers to the common name or the nature of an article, and most courts hold it is not entitled to trademark protection. *Id.* A descriptive mark designates the characteristics, qualities, effects or other features of the product, and is protectable only if shown to have become distinctive, that is, shown to have acquired a secondary meaning. *Id.* Suggestive marks, which require imagination to reach a conclusion as to the nature of the goods, and arbitrary or fanciful marks which are inherently distinctive, are entitled to immediate protection without establishing secondary meaning. *Id.*

### 1. "No Scissors" Logo

■ Concerning Ellison's assertion that it is entitled to trademark protection in the "no scissors" logo, the Court finds that the logo must be analyzed as a descriptive mark. Specifically, the red circle with a line through it is universally recognized as meaning "no" which, combined with the scissors, conveys the message that Ellison's product does something that scissors do without the need for scissors. Therefore, the "no scissors" logo designates the characteristics, qualities or effects of Ellison's product. *See Co–Rect Products*, 780 F.2d at 1329.

■ There has been no evidence presented to the Court that Ellison has registered the "no scissors" logo as a trademark. However, registration is not a prerequisite for protection under 15 U.S.C. § 1125(a), and a claimant can succeed on a claim of false designation of origin with respect to an unregistered descriptive mark by showing that (1) the mark has acquired a secondary meaning, and (2) another's use of the same or similar mark actually confuses or is likely to cause confusion among consumers as to the source of the product. *Co–Rect Products*, 780 F.2d at 1329–30. Secondary meaning converts a word originally incapable of serving as a mark into a full-fledged trademark. The user must show that secondary meaning existed prior to the date on which a defendant commenced using the same or similar mark. *Id.* at 1330. To establish secondary meaning, the user must show that the mark or symbol "by long and exclusive use and advertising by one person in the sale of his goods and services [has] become so associated in the public mind with such goods or services that it serves to identify them and distinguish them from the goods or services of others." *Shoppers Fair of Arkansas, Inc. v. Sanders Co.*, 328 F.2d 496, 499 (8th Cir.1964). Secondary meaning is an association formed in the minds of the consumers between the mark and the source or origin of the product, and the ultimate inquiry is whether in the consumer's mind, the mark denotes a "single thing coming from a single source." *Co–Rect Products*, 780 F.2d at 1330.

■ In this case, Ellison alleges that it adopted the "no scissors" logo as early as 1985 and has used the "no scissors" logo on convention and workshop buttons and in convention advertisements (Filing No. 30, ¶ 16). Ellison alleges that the "no scissors" logo was prominently featured on the cover of the *Cut It Out* booklet which was published in 1986 and which Ellison alleges sold approximately fifteen hundred (1,500) copies in 1990 alone (Filing No. 30, ¶ 16). The *Cut It Out* booklet is sold by Ellison and provides ideas for making games, crafts and displays using Ellison letters

and numbers. Ellison has also submitted a copy of its advertisement appearing in the annual convention program for the 1987 American Library Association convention held in San Francisco which depicts the "no scissors" logo (Filing No. 30, Exhibit 15). Ellison points out that the "no scissors" logo is displayed in its 1988–1989 brochure (Exhibit Q1), and its 1989–1990 brochure (Exhibit Q). Ellison utilizes print advertising including magazine advertisements, catalogs, fliers and mailings (Filing No. 30, ¶ 14). Ellison alleges that in 1990, it spent in excess of $96,000 in print advertising, which includes advertising at least three times a year in *Instructor* magazine, a national publication directed to educators.

The Court notes that only *one* depiction of the "no scissors" logo occurs in Ellison's 1988–1989 brochure, which comprises nineteen (19) pages (Exhibit Q1, p. 7), and only *one* depiction occurs in Ellison's 1989–1990 brochure, which comprises twenty-three (23) pages (Exhibit Q, p. 11). This depiction appears in Ellison's display of its book, *Cut It Out,* which contains the "no scissors" logo on its cover, and it is not displayed as a part of the brochure itself. Further, the back cover page of each brochure portrays a woman holding scissors with the caption "Are you tired of cutting out letters?", but does not display the universal "no" symbol over the scissors. It is also interesting to note that the advertisement submitted by Ellison which it alleges is "a representative example of an advertisement" appearing in *Instructor* magazine contains a large scissors with the caption "Are you tired of cutting out letters?" but does not contain the universal "no" symbol over the scissors (Filing No. 30, Exhibit 9).

The evidence currently before the Court demonstrates that advertisements by Ellison are not uniform in that some depict the "no scissors" logo and others are depicted with a scissors only and not the universal "no" symbol over the scissors. To establish secondary meaning, Ellison must demonstrate that by long and exclusive use in advertising and the sale of its goods the "no scissors" logo has become so associated in the public mind with the sale of such goods that it serves to identify them and

distinguish them from the goods of others. The evidence currently before the Court demonstrates only sporadic and inconsistent use of the "no scissors" logo, and it appears that the logo has not acquired "secondary meaning" within the meaning of the trademark laws. Although Ellison alleges it has intended to utilize the "no scissors" logo as its trademark, it is established that the "desires or intentions of the creator, or even the owner, are irrelevant. Instead, it is the attitude of the consumer that is important." *Co–Rect Products v. Marvy! Advertising Photography,* 780 F.2d 1324, 1332 (8th Cir.1985).

█ As there is currently little evidence before the Court that Ellison's long and exclusive use of the "no scissors" logo has created in the consumer's mind an impression that the logo is associated with Ellison within the meaning of the trademark laws, the Court finds Ellison has little probability of success on the merits relating to its "no scissors" logo claims. After careful consideration of the elements set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109 (8th Cir.1981) (en banc), the Court finds that injunctive relief is not warranted on Ellison's claim relating to the "no scissors" logo. Specifically, there is currently no evidence of irreparable harm or consumer confusion as to the logo, and it appears that any harm to Ellison would not outweigh the injury caused to Accu–Cut if the Court were to grant injunctive relief.

### 2. Ellison's Name

█ In support of its allegation that Accu–Cut's actions constitute trademark infringement of Ellison's name, Ellison refers to Accu–Cut's brochure in which Accu–Cut states:

ALSO AVAILABLE ... DIES FOR THE ELLISON LETTER MACHINE!

In addition to the larger Accu–Cut dies, we also have an extensive line of smaller dies for the Ellison Letter Machine ... and at very competitive prices! Just call

us at 1–800–288–1670 for further information.

(Exhibit 5) (ellipsis in original).

At the hearing, James Nichols testified that this reference in Accu–Cut's brochure was for the purpose of informing potential customers that Accu–Cut's dies also came in smaller widths and could therefore fit in the Ellison Letter Machine. Nichols testified that Accu–Cut did not intend to convey the message that it sold Ellison dies. Nichols further testified that upon receiving a cease and desist letter from Ellison dated October 2, 1990 (Filing No. 30, Exhibit 19), Accu–Cut attempted to do whatever it could to comply with Ellison's demands. For example, Accu–Cut gave Ellison over seventy (70) shapes to examine and stamped on its existing brochures the following disclaimer:

> Ellison Letter Machine is a product of Ellison Educational Equipment and is not affiliated with Accu–Cut Systems, Inc.

In addition, Accu–Cut prepared a new brochure which is identical to its previous brochure except for an inclusion of this same disclaimer along the bottom of the brochure with an ellipses at the end of the reference to "Ellison Letter Machine" directing the reader to that disclaimer (Exhibit 6).

Ellison also refers to Accu–Cut's marketing in its brochure an item entitled "Ellison Die Adapter" (Exhibit Nos. 5 and 6). At the hearing, Nichols testified that the "Ellison Die Adapter" allows Ellison dies to be used on the Accu–Cut roller cutting machine. The Ellison dies are approximately one-half the width of the Accu–Cut dies and the adaptor enables these smaller dies to be used in the Accu–Cut machine.[5] In further support of its allegations, Ellison refers to an order form submitted by Frances E. Henson in which Henson ordered an

Accu–Cut roller cutting machine, a "boy" die, an "Ellison Die Adaptor" (sic),[6] and a "Teddy Bear Smaller 'Ellison Die' " (Exhibit 10). The typed invoice prepared by Accu–Cut in response to the order lists an "Ellison Die Adapter" and a "Teddy Bear-Smaller 'Ellison Die' " (Exhibit 11). At the hearing Steven Nabity testified that Accu–Cut's secretary typed the invoice using all words exactly as they appeared on the order form. This is the only evidence cur·rently before the Court concerning allegations of trademark infringement of Ellison's name.

In order to obtain protection of its name as a trademark pursuant to 15 U.S.C. § 1125(a), Ellison must establish that its name is non-functional and has acquired a secondary meaning, and that Accu–Cut's use of Ellison's name has actually confused or is likely to cause confusion among consumers as to the source of the products. The Court finds that Ellison's name is non-functional in that it is "an arbitrary embellishment primarily adopted for purposes of identification and individuality." *See Prufrock Ltd. v. Lasater*, 781 F.2d 129, 133 (8th Cir.1986). Further, the Court finds that Ellison's name has acquired secondary meaning in that through long and exclusive use in advertising, Ellison's name has become associated in the public mind with goods sold by it that it serves to identify them and distinguish them from the goods of others. *See Co–Rect Products v. Marvy! Advertising Photography*, 780 F.2d 1324, 1330 (8th Cir.1985).

In determining whether a likelihood of confusion exists, the Court must consider the following factors:

> (1) The strength of the owner's mark;
> (2) the similarity between the owner's mark and the alleged infringer's mark;
> (3) the degree to which the products com-

---

**5.** The actual die adaptor is labeled "Small Die Adaptor" and not "Ellison Die Adaptor" as is referenced in the brochure.

**6.** The order form submitted by Henson has listed an "Ellison Die Adaptor." The misspelling of the word "adaptor" is corrected with a slash drawn through the "o" and the letter "e" inserted above the slash. Wilberta E. Brakenhoff, Accu–Cut's secretary, submitted an affidavit

wherein she states that she made the correction on the order form because she is a "stickler for spelling" (Affidavit of Brakenhoff, ¶ 2). She further states that she "typed up the invoice using the same exact words as found on the order form" and that she had no intent to imply that Accu–Cut sold Ellison dies (Affidavit of Brakenhoff, ¶ 3).

pete with each other; (4) the alleged infringer's intent to pass off its goods as those of the trademark owner (but intent is not an element of an infringement claim); (5) incidents of actual confusion; and (6) whether the degree of purchaser care can eliminate any likelihood of confusion which would otherwise exist. *Life Technologies, Inc. v. Gibbco Scientific, Inc.*, 826 F.2d 775, 776 (8th Cir.1987). Each factor must be considered and excessive weight should not be given to any one factor to the exclusion of others. *Id.* Since trademarks and trade dress represent intangible assets such as reputation and good will, a showing of irreparable injury can be satisfied if it appears that the movant can demonstrate a likelihood of consumer confusion. *See, e.g., General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir.1987).

Concerning instances of actual confusion,[7] Ellison has submitted the declaration of Pat Neal in which she declares that she became confused after reviewing Accu-Cut's brochure as to whether Accu-Cut sold Ellison dies. The Court notes that the brochure reviewed by Neal is Accu-Cut's earlier brochure (Exhibit 5). The earlier brochure does not have the notation contained in the subsequent issued brochure which disclaims any association of Ellison with Accu-Cut (Exhibit 6).

Although at the hearing testimony was presented that Accu-Cut did not intend to pass off its goods as being Ellison products, it appears that at least one instance of actual confusion has in fact resulted. In consideration of the elements set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981) (en banc),

and to protect Ellison from irreparable injury resulting from consumer confusion, the Court will enjoin Accu-Cut from any reference to Ellison, Ellison Educational Equipment, Ellison Letter Machine, or any other use of the Ellison name without an accompanying notation disclaiming any association of Ellison with Accu-Cut.

### 3. Cutout Shapes

 Ellison alleges trademark infringement relating to forty-seven (47) of its shapes.[8] Ellison can obtain protection for its trade dress under the trademark laws if the shapes are non-functional, have acquired a secondary meaning, and Accu-Cut's imitation of them creates a likelihood of confusion in the consumer's mind as to the origin of the product.

Concerning the requirement of nonfunctionality, the Court in *Prufrock Ltd. v. Lasater*, 781 F.2d 129 (8th Cir.1986), stated that the requirement insures that in our free enterprise system, the ability to compete through imitation is not unduly hampered. *Id.* at 133. The question in each case is whether protection against imitation will hinder the competitor in competition. If an element of the trade dress is unrelated to the consumer demand for the product and serves merely to identify the source of the product, then the prohibition against imitation will not hinder honest competition. *Id.*

In *Prufrock*, the Court found that trade dress did not include the "core concept" of a restaurant. Specifically, the plaintiff sought trade dress in its concept of "a full-service restaurant, serving down home country cooking, in a relaxed and informal atmosphere, with a full-service bar."[9] *Id.*

---

7. On February 21, 1991, Ellison filed a motion for leave to file supplemental evidence and memorandum (Filing No. 43). Ellison seeks to prove actual consumer confusion by introducing the supplemental declaration of Lisa Corcoran. Corcoran's declaration relates to alleged statements made to her by a consumer that the latter was confused. On its own motion, the Court finds the declaration to be inadmissible hearsay pursuant to Fed.R.Evid. 802 and will therefore deny Ellison's motion for leave.

8. There are no allegations of infringement relating to the design and construction of the Ellison

Letter Machine and Accu-Cut roller cutting machine or the construction of each parties' respective dies. Rather, it is the *shapes* produced by the dies themselves in which Ellison is seeking protection.

9. The core concept of the plaintiff's restaurant included employing all or any of the following items: (a) church pews or church pew replica booth seating; (b) small print wallpaper; (c) antique or antique replica wooden drop leaf tables; (d) exposed kitchen area; (e) large open dining room with booths on side walls; (f) antique or antique replica light fixtures; (g) an-

at 131. The Court found that the test for nonfunctionality did not permit the plaintiff to protect the trade dress which created the informal country dining concept. The Court reasoned that granting the plaintiff trade dress protection and thereby prohibiting another restaurant from using an exposed kitchen would hinder competition because watching the food preparation can be a part of the consumer appeal for the food service product. "A restaurant should not be able to monopolize functional components which improve the usefulness, efficiency, or appeal of the product or service." *Id.* at 133. However, the Court stated that if an element of the trade dress is unrelated to the consumer demand for the product and serves merely to identify the source of the product, then a prohibition against imitation will not hinder honest competition. For example, prohibiting a restaurant from imitating another's distinctive and identifying logo will not hinder competition. The Court stated that "[e]arly comers may not exclude latecomers. One may not welcome new competition, but one may not legally complain of it." *Id.*

In *Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210 (8th Cir), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976), the Court stated:

> If the particular feature is an important ingredient in the commercial success of the product, the interests in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

*Id.* at 1217–18.

In *W.T. Rogers Co. v. Keene,* 778 F.2d 334 (7th Cir.1985), the Court discussed the element of "functionality" in a trademark infringement action relating to a hexagonal end panel of a manufacturer's letter tray. The Court stated that the concept of functionality is intended to screen out from the protection of trademark law certain design features even if they have become so far identified with the manufacturer of a particular brand that consumers may be confused about the origin of the goods if another producer is allowed to adopt the feature. *Id.* at 338. The Court stated that if the feature is ornamental, fanciful, or decorative, like the patterns on a piece of china, then the manufacturer can use it as his name, symbol, or identifying mark. This is because ornamental, fanciful shapes and patterns are not in short supply so that appropriating one of them to serve as an identifying mark does not take away from any competitor something that he needs in order to make a competing brand. *Id.* at 339. However, the Court stated that "generic" designs of a product such as its shape and pattern, may not be given trademark protection if the feature is *somehow intrinsic to the entire product consisting of this manufacturer's brand and his rivals' brands. Id.* For example, the first company to make an airplane cannot use the characteristic shape of an airplane as its trademark, thereby condemning its rivals to build airplanes that won't fly. The Court further stated:

> A firm that makes footballs could not use as its trademark a characteristic oval shape of the football, thereby forcing its rivals to find another shape for their footballs; since they wouldn't be able to sell any round or oblong or hexagonal footballs, that firm would have, not an identifying mark, but a product monopoly, and a product monopoly not for a term of years under the patent laws, but forever.

> The football's oval shape is "functional" in the following practical sense: it would be found in all or most brands of the product even if no producer had any de-

tique or antique replica bar; and (h) country wall decor including old or antique kitchen im-

plements, small farm implements, photographs, quilts and the like. *Prufrock,* 781 F.2d at 131.

sire to have his brand mistaken for that of another producer. A feature functional in this sense—a feature that different brands share rather than a feature designed to differentiate the brands—is unlike those dispensable features of the particular brand that, like an arbitrary identifying name, rivals do not need in order to compete effectively.... To put this differently, a functional feature is one which competitors would have to spend money not to copy but to design around, as they would have to do if they wanted to come up with a nonoval substitute for a football.

*Id.*

In this case, Ellison seeks to assert trademark protection in forty-seven (47) various designs. These designs are silhouettes of common, ordinary items such as a football and a banana. Ellison alleges that consumers have become so identified with its various shapes that consumers will be confused about the origin of the goods if Accu–Cut is permitted to utilize those same designs. After careful review and consideration of all relevant authority, the Court finds that Ellison's designs are functional within the meaning of the trademark laws and are, therefore, not entitled to protection. Specifically, granting Ellison trademark protection would hinder, if not virtually eliminate, competition because those shapes are important ingredients in the commercial success of the product. Ellison and Accu–Cut's cutting machines are marketed primarily to educational environments to facilitate the education of children. At the hearing, the parties testified that it is necessary in the marketing of this type of product that certain shapes be available. For example, the shapes produced by the die punch machines are used to assist children in language development. Specifically, the apple shape is generally used to demonstrate the short vowel sound for the vowel "a" and the acorn shape is used to demonstrate the long vowel sound for the vowel "a." The selection of shapes must be interesting and easily recognizable to children. Therefore, only a finite number of shapes are available for certain specific purposes in the educational environment.

The shapes involved in this action are essential ingredients to the commercial success of the product as they are directly related to basic consumer demands. If the Court were to grant Ellison trademark protection to the use of its shapes, it would be granting Ellison a product monopoly that would last virtually forever. As there are few ways at most to create a silhouette of a banana and still have it easily recognizable as a banana, competitors of Ellison would be forced out as each respective competitor would be required to find a shape for their version of the banana which was different than all of the earlier versions of the banana. Clearly silhouettes of ordinary common shapes such as exist in this case are not entitled to protection within the meaning of the trademark laws. *See also Brandir International, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142, 1148 (2d Cir.1987) (the true test of functionality is not whether the feature in question performs a function, but whether the feature is dictated by the functions to be performed as evidenced by available alternative constructions).

The Court further finds Ellison's argument that its shapes have become so identifiable in the consumer's mind that it should be entitled to trademark protection to be without merit. The reason consumers view cut-out shapes as originating from Ellison is that Ellison appears to have been the only entrant in this market prior to Accu–Cut.[10] Although Ellison as an early comer may not welcome new competition, it may not exclude latecomers under the trademark laws. *See Prufrock, Ltd. v. Lasater*, 781 F.2d 129 (8th Cir.1986).

In consideration of the elements set forth in *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc), the Court finds Ellison has little, if any, probability of success on the merits. Further, the public interest does not favor granting Ellison a virtual monopoly without any competition. In addition,

---

**10.** At the hearing, the parties testified that Accu– Cut is the only known competitor of Ellison.

the evidence satisfies the Court that Accu–Cut would be unable to continue in business if it were enjoined from marketing the forty-seven (47) shapes at issue. Accordingly, the Court finds that Ellison's request for injunctive relief should be denied.

### B. *Copyright Claims*

 Ellison seeks to assert copyright protection in the forty-seven (47) various shapes offered by both it and Accu–Cut. To establish a violation of the exclusive entitlements granted to a holder of the copyright pursuant to 17 U.S.C. § 106, the plaintiff must show:

1. Plaintiff's ownership of the allegedly infringed work; and

2. Defendant's "copying" of the copyrighted work.

*Nelson v. PRN Productions, Inc.*, 873 F.2d 1141, 1142 (8th Cir.1989). Copying may be proven either by direct evidence or by demonstrating circumstantial evidence establishing (1) access by defendant to plaintiff's work, and (2) substantial similarity of the two works. *Id. See also Midway Mfg. Co. v. Dirkschneider*, 571 F.Supp. 282, 284 (D.Neb.1983).

 Under the copyright act, a certificate of registration "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). *See also Midway Mfg. Co. v. Dirkschneider*, 571 F.Supp. 282, 284 (D.Neb.1983).[11] Ellison has submitted copyright registrations evidencing that it has sought copyright protection for various of its dies, catalogs and flyers, and the Ellison Letter Machine (Filing No. 30, Exhibit 18). However, even though a certificate of registration is prima facie evidence

of the validity of the copyright, the certificate creates no irrebuttable presumption of copyright validity. *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 414 (2d Cir.1985).

Pursuant to 17 U.S.C. § 102(a)(5), copyright protection is extended to "pictorial, graphic, and sculptural works." *Id.* However, 17 U.S.C. § 101 provides that "the design of a useful article ... shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." *Id.*

In *Brandir International, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142 (2d Cir.1987), the Court discussed the reference to "pictorial, graphic and sculptural works" contained in 17 U.S.C. § 101. The Court referred to the legislative history concerning the criteria of separate identity and independent existence which states:

> On the other hand, although the shape of an industrial product may be aesthetically satisfying and valuable, the Committee's intention is not to offer it copyright protection under the bill. Unless the shape of an automobile, airplane, ladies' dress, food processor, television set, or any other industrial product contains some element that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article, the design would not be copyrighted under the bill.

*Id.* at 1143 (citing H.R.Rep. No. 1476, 94th Cong., 2d Sess. 54, 55, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5668). In *Brandir*, the Court found that a bicycle rack was not copyrightable. The rack was manufactured from two and three-eighths

---

11. Accu–Cut argues that Ellison is not entitled to copyright protection because it has not complied with the statutory formalities. Pursuant to 17 U.S.C. § 405(a)(2), the omission of a copyright notice does not invalidate the copyright in a work if "registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies ... distributed to the public in the United States

after the omission has been discovered." *Id.* Ellison alleges it was uneducated about copyright formalities prior to 1987 and did not include a copyright notice on its works from 1983 to 1986. However, upon learning of the notice requirement, Ellison alleges it immediately complied with the requirement. The Court finds it need not address this issue as it has found that Ellison's shapes are not entitled to protection under the copyright laws.

inch (2⅜″) tubular rust-roof galvanized steel bent into a form which permitted all types of bicycles and mopeds to benefit from its design. The Court reasoned that "the form of the rack is influenced in significant measure by utilitarian concerns and thus any aesthetic element cannot be said to be conceptually separable from the utilitarian elements." *Brandir*, 834 F.2d at 1147. The Court stated that while the rack may be worthy of admiration for its aesthetic qualities alone, it remained nonetheless the product of industrial design. "Form and function are inextricably intertwined in the rack, its ultimate design being as much the result of utilitarian pressures as aesthetic choices. Indeed, the visually pleasing proportions and symetricality of the rack represent design changes made in response to functional concerns." *Id.*

In *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411 (2d Cir.1985), the Court held that mannequins of partial human torsos used to display articles of clothing were not copyrightable. The Court reasoned that the mannequins did not possess artistic of aesthetic features that were physically or conceptually separable from their utilitarian dimension because, for example, the configuration of the chest and width of the shoulders was inextricably intertwined with the utilitarian feature of the display of clothes. *Id.* at 419. The Court refused to adopt a test that would distinguish between mannequins in an attempt to determine whether certain non-utilitarian concepts existed in a particular mannequin. The Court stated that attempting to evaluate "numerous factors, including the material used, the angular configuration of the limbs, the facial features and the hair" demonstrate the "bottomless pit" that would be created from the adoption of such a vague test. *Id.* at 419 n. 5. The Court disagreed with the proposition that the mannequins could be viewed by the ordinary observer as any-

thing other than objects having a utilitarian function as mannequins. *Id.*

■ In this case, Ellison seeks to assert copyright protection in forty-seven (47) of its various shapes. As previously noted, the designs are merely silhouettes of ordinary, common items which are generally readily identifiable by even young children. The parties' products are marketed to educational environments to facilitate the teaching of children. The Court finds that the shapes in this case do not possess artistic or aesthetic features which are physically or conceptually different from their utilitarian function. Although the shapes can be said to have artistic and aesthetic features, they are inextricably intertwined with the utilitarian function and are therefore not entitled to copyright protection. As there are an extremely finite number of ways to alter the shape of, for example, a dog bone and still have it readily be identifiable as a dog bone, granting Ellison copyright protection would in essence grant it a virtual monopoly.[12] Accordingly, the Court finds that Ellison has little, if any, probability of success on the merits. The Court further finds that the public interest does not favor giving Ellison a virtual product monopoly without competition. Accordingly, the Court finds that injunctive relief is not warranted. *See Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981) (en banc). A separate order in accordance with this opinion will be entered this date.

### ORDER

Pursuant to the memorandum opinion entered herein this date,

IT IS ORDERED:

1) Ellison Educational Equipment, Inc.'s motion for leave to file supplemental evidence and memorandum (Filing No. 3) is denied;

2) Accu–Cut Systems, Inc., and Steven Nabity are enjoined from referring to Elli-

---

12. Granting Ellison copyright protection in the silhouette of a dog bone would force competitors to alter their respective shapes of a dog bone. As a subsequent competitor's dog bone could not under the copyright laws be substan- tially similar to an earlier competitor's version, the conceivable result is that competitors' dog bones will eventually look like rectangles or ovals.

son Educational Equipment, Inc., Ellison Letter Machine, or from using any other reference to the Ellison name without an accompanying notation disclaiming any association of Ellison with Accu–Cut Systems, Inc.;

3) Ellison Educational Equipment, Inc.'s request for preliminary injunctive relief is denied as to all remaining aspects.